**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EULA M.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 17 C 6669** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Eula M. ("plaintiff") seeks judicial review of a final decision of defendant Nancy Berryhill, the Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied plaintiff's application for disability insurance benefits and social security income initially on November 5, 2014 and upon reconsideration on June 15, 2015. An Administrative Law Judge ("ALJ") issued a written decision on March 29, 2017 that also denied plaintiff's claims. (R. 15-34). The Appeals Council denied her request for review on July 14, 2017, making the ALJ's opinion the Commissioner's final decision. Plaintiff appealed the ALJ's decision to federal court on September 15, 2017 and both parties consented to proceed before this Court on October 26, 2017 for all purposes, including final judgment. (Dckt. # 13). On May 15, 2018, plaintiff filed a motion for summary judgment seeking to reverse the Commissioner's decision. (Dckt. # 28). The Commissioner filed a cross-motion for summary judgment on August 30, 2018. (Dckt. # 35). For the reasons discussed below, plaintiff's motion is granted and the Commissioner's motion is denied.

## I. BACKGROUND

### A.      Procedural History

On June 12, 2014, plaintiff filed an application for Disability Insurance Benefits ("DIBs")

alleging a disability beginning on May 19, 2013.  (R. 28, 171).  Her claim was denied initially on

November 5, 2014, and again upon reconsideration on June 15, 2015.  (R. 15).  Plaintiff filed a

hearing request on July 20, 2015 pursuant to 20 C.F.R. § 404.929 *et seq*.  (R. 189-90).  The ALJ

held an initial hearing on July 15, 2016 that was continued when the medical expert stated that he

had not reviewed the complete record.  (R. 74-104).  A second hearing with a new medical

expert was held on November 29, 2016.[1]  (R. 41-73).  On March 29, 2017,  the ALJ issued a

written decision denying plaintiff's claim for DIBs.  (R. 15-34).  Plaintiff then requested review

by the Appeals Council.  (R. 308-09).  On July 14, 2017, the Appeals Council denied her request

for review, at which time the ALJ's decision became the final decision of the Commissioner.  (R.

1-6).  *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  Plaintiff subsequently filed this

action in the District Court.

### B.      Medical Evidence in the Administrative Record

Plaintiff joined the United States armed forces in 1983 and participated in Operation

Desert Storm in an administrative capacity in Riyadh, Saudi Arabia.  On February 25, 1991, a

SCUD missile struck the barracks across from plaintiff's own barracks, killing 28 American

soldiers.  (R. 507).  Plaintiff developed symptoms related to post-traumatic stress disorder

("PTSD") from that event.  She also suffers from recurring migraine headaches, knee pain, and

lower-back pain.  The Veterans Administration ("VA") eventually determined that she did not

meet the diagnostic criteria for PTSD as set out in the DSM-5.  (R. 610).  Her migraine

---

[1]  The record also contains the transcript of a hearing held on April 8, 2013 in relation to an earlier
disability claim that plaintiff had filed.  (R. 105-43).

headaches, however, were sufficient for the VA to find that she was 60 percent disabled by them. (R. 502). Plaintiff underwent multiple therapies and treatments for her physical and mental issues with the VA, including physical therapy, medications, psychiatric treatment, and counseling.

### 1.      Evidence from the State Agency Physicians and Consultants

On October 31, 2014, state-agency expert Dr. Vidya Madala concluded that plaintiff did not suffer from a severe physical impairment and could therefore carry out work at all exertional levels. (R. 147-48, 154). On the other hand, Dr. Glen Pittman found that her complaint of anxiety constituted a severe impairment. (R. 149). Dr. Pittman issued mental RFC findings that placed moderate limitations on plaintiff's ability to carry out detailed instructions or to maintain attention and concentration for extended periods. (R. 150-52). These findings were confirmed at the reconsideration stage by Dr. Michael Cremerius who found that plaintiff suffered from a severe affective disorder in addition to her anxiety disorder. (R. 163-67). Dr. Cremerius stated that plaintiff would require "reduced" interaction with the public but she could handle "brief, infrequent, and superficial contact." (R. 167).

On October 1, 2014, Dr. Liana Palacci examined plaintiff's physical condition at the request of the SSA. Dr. Palacci found that plaintiff, who was morbidly obese, had a limited range of motion of 130/150 in her left knee. Her gait was non-antalgic, and her straight-leg test was negative. She had normal strength in all of her extremities with no loss of sensation. Dr. Palacci diagnosed plaintiff with complaints of lower-back pain, obesity, well-controlled hypertension, and a history of depression and PTSD. (R. 493-96).

Dr. Henry Fine conducted a mental exam of plaintiff on the same day. Plaintiff told Dr. Fine that she was easily angered and experienced panic attacks two to three times a month

though these attacks had started in 2007.  Plaintiff described the attacks as "like a heart attack" with shortness of breath and chest pain.  She spent most of the day in her room trying to rest. Plaintiff was able to recall digits forward for four and five numbers.  She demonstrated no delusions.  Dr. Fine diagnosed her with moderate PTSD with panic attacks.  (R. 488-91).

Finally, and most recently, Dr. Gregory Sarlo examined plaintiff on August 31, 2016 and issued the most detailed report in the record.  (R. 1008-1018).  Plaintiff told Dr. Sarlo that she did not seek treatment for depression until 2010 and for PTSD until 2015.  Dr. Sarlo conducted multiple objective tests on plaintiff, including the Wechsler Adult Intelligence Scale ("WAIS-IV"), which showed a low average IQ of 89.  She also rated low average in the Working Memory Index ("WMI") and Processing Speed Index ("PSI") but was average in the Perceptual Reasoning Index ("PRI").  Dr. Sarlo also administered the Minnesota Multiphasic Personality Inventory ("MMPI-2").  He concluded that plaintiff was experiencing "intense psychological turmoil and distress" with high levels of depression and difficulty in expressing anger.  (R. 1014). Dr. Sarlo concluded that plaintiff's stress "far exceeds her coping abilities" and diagnosed her with PTSD and severe depression.  (R. 1016-17).

## 2.    Evidence from Treating Physicians

Plaintiff was treated for her mental problems by psychiatrist Dr. Chan Tsai, who issued a series of reports to the Illinois State Retirement System about plaintiff's condition.[2]  Dr. Tsai's reports state that he was treating plaintiff for depression, anxiety with panic attacks, migraine headaches, and chronic pain.  Treatment included prescriptions at various times for

---

[2] Plaintiff gave an unclear account of her work history, but she stated at the first administrative hearing held on April 8, 2013 that she was on leave from her employment with the State of Illinois at the time of Dr. Tsai's reports.  (R. 115).  Dr. Tsai and Dr. Keith Burgard appear to have issued multiple Nonoccupational Disability Medical Reports as part of this absence from work, though neither plaintiff nor the ALJ clarified this murky part of the record.

4

Escitalopram, Citalopram, Amitripyline, Nortriptyline, Trazodone, Lorazepam, and Tylenol #3. (R. 456, 459, 472, 484). Dr. Tsai stated in each of the reports that plaintiff could not return to work. Dr. Keith Burgard issued similar reports concerning plaintiff's physical condition.

### 3. Evidence from the Administrative Hearing

The ALJ held an administrative hearing on July 15, 2016 at which plaintiff appeared.[3] Her testimony was not entirely clear but plaintiff told the ALJ that she took the medications Midrin, Imitrex, and Nortriptyline for her migraine headaches. (R. 81). She also tried acupuncture and Botox. Acupuncture was helpful for about an hour, and the Botox injection made the right side of her face droop. (R. 82). Plaintiff stated that her migraines made her sensitive to light and sound and interfered with her concentration. When the pain begins she must lie down for three hours in a dark room. (R. 90). The ALJ noted that plaintiff's record shows that she missed appointments for her physical therapy sessions, and plaintiff explained that was because of her migraine headaches. (R. 94). The ALJ then called medical expert Dr. Allen Heinmann to testify. Dr. Heinmann stated that plaintiff's primary mental health diagnosis was PTSD. After his initial statement, however, it became clear that Dr. Heinmann had not been given a copy of plaintiff's complete medical record, and the ALJ terminated the hearing.

A second hearing was held on November 29, 2016 at which psychological expert Dr. Michael Cremerius testified. Dr. Cremerius stated that plaintiff's primary diagnoses were an affective disorder and an anxiety disorder with PTSD. (R. 46). Nevertheless, he testified that plaintiff's restrictions stemmed more from her headaches and chronic physical pain than from these mental impairments. (R. 49, 51). Dr. Cremerius stated that there was no interrelationship

---

[3] An earlier hearing was held on April 8, 2013 as part of a prior disability application that plaintiff had filed. Plaintiff testified at the time that she was experiencing panic attacks twice a week. (R. 137).

between plaintiff's headaches and her mental health.  (R. 51).  He concluded that plaintiff could understand simple details and could do both simple and detailed tasks but could not follow complex instructions.  (R. 50).  Her PTSD would permit only incidental contact with the public and occasional contact with co-workers and supervisors.  No fast-paced tasks or strict production quotas should be permitted as part of her work.  (R. 50).

## C.    The ALJ's Decision

The ALJ issued a decision denying plaintiff's application for benefits on March 29, 2017.  Applying the five-step sequential process, the ALJ found at Step 1 that plaintiff had not engaged in substantial gainful activity from her alleged onset date of May 19, 2013 through the last insured date of December 31, 2015.  (R. 17).  Plaintiff's severe impairments at Step 2 were obesity, anxiety and affective disorders, PTSD, migraine headaches, degenerative disc disease, and degenerative joint disease.  (R. 18).  None of these impairments met or medically equaled a listing at Step 3 either singly or in combination.  (R. 18).  The ALJ also evaluated the "paragraph B" criteria for mental disorders at Step 3.[4]  The ALJ found that plaintiff had moderate limitations in (1) understanding, remembering, or applying information, (2) interacting with others, and (3) concentrating, persisting, and maintaining pace but (4) only had a mild restriction in adapting or managing herself.  (R. 18-19).

---

[4] The SSA assesses mental disorders by applying Paragraph A, B, and C criteria under the listings.  *See Herron v. Comm. of Soc. Sec.*, 788 F.Supp.2d 809, 816 (N.D.Ind. 2011).  Prior to January 1, 2017, the Paragraph B factors addressed a claimant's (1) activities of daily living, (2) social functioning, (3) ability to maintain concentration, persistence, or pace, and (4) episodes of decompensation.  Because the ALJ's decision was issued on March 29, 2017, she correctly referenced the new paragraph B criteria that apply to claims filed on, or claims that were pending as of, January 17, 2017.  *See* 81 Fed.Reg. 66,138 (Sept. 26, 2016).  The new criteria also apply to the "special technique" set out in 20 C.F.R. § 404.1520a for evaluating the severity of mental disorders.  *See Montgomery v. Comm. of Soc. Sec.*, No. 17 C 617, 2019 WL 1427560, at *6 (W.D.Ky. March 29, 2019).

Before turning to Step 4, the ALJ found that the record did not fully support all of plaintiff's testimony concerning her symptoms. The ALJ also assessed plaintiff's RFC. Since the RFC constitutes the primary dispute in this case, the Court cites the ALJ's detailed assessment in full:

> [T]he claimant had the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except she is able to lift or carry 20 pounds occasionally and 10 pounds frequently; she is able to sit for six hours, stand for six hours and walk for six hours in an eight hour workday; she is able to push and pull to the same extent that she can lift or carry; she is able to climb ramps and stairs occasionally, but never climb ladders, ropes or scaffolds; she is able to occasionally stoop, kneel, crouch, and crawl; she is limited to no exposure to unprotected heights, moving mechanical parts; no exposure to humidity, wetness, vibrations, extreme cold and extreme heat; she can work in nothing more than a moderate noise environment; she is unable to work outside; she is limited to simple, routine and repetitive tasks but not at a production rate pace (such as assembly line work); she is limited to simple work related decisions; she is able to have occasional interaction with supervisors, co-workers and the public with few changes in the routine work setting defined as unskilled work.

(R. 20). Based on this RFC, the ALJ found at Step 4 that plaintiff could not perform any of her past relevant work. (R. 32). A vocational expert testified that jobs existed in the national economy that a person with plaintiff's RFC could perform. Accordingly, the ALJ concluded at Step 5 that plaintiff was not disabled. (R. 34).

## II. LEGAL ANALYSIS

### A.      The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §

405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, --- S.Ct. ---, 2019 WL 1428885, at *3 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III. DISCUSSION

Plaintiff argues that the ALJ's decision requires remand because substantial evidence does not support her evaluation of plaintiff's symptom allegations or the RFC assessment. The Court agrees that that remand is necessary on both issues.

### A. The ALJ Failed to Build a Logical Bridge Between the Record and Plaintiff's RFC

The RFC addresses the maximum work-related activities that a claimant can perform despite the limitations that stem from his or her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The task of assessing a claimant's RFC is reserved to the Commissioner instead of to a medical expert. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "In

determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Id.* Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; the reports of activities of daily living ("ADL"); medical source statements; and the effects of the claimant's symptoms. SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).[5]

The RFC must accommodate all of a claimant's limitations that are supported by the record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). In addition, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. That includes an explanation of why the claimant is able "to perform sustained work activities in an ordinary work setting on a regular and continuing basis" eight hours a day for five days a week. *Id.*

The ALJ's RFC assessment included exertional and non-exertional restrictions for plaintiff's physical and mental impairments. Plaintiff attacks the RFC on multiple grounds but the Court begins by addressing the ALJ's initial finding: specifically, the ALJ found that plaintiff can carry out light work that requires her to lift, push, pull, or carry 20 pounds occasionally and ten pounds frequently, and she is able to sit, stand, and walk up to six hours in an eight-hour workday. (R. 20). Plaintiff argues that the ALJ failed to provide any explanation of how she reached these conclusions.

---

[5] Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). They do not have the force of law or a regulation, though they are binding on the SSA. *Id.*

The Court agrees that remand is necessary on several grounds related to these exertional findings. For one, the Commissioner has not addressed plaintiff's argument about her ability to lift, carry, sit, and stand other than to state that the ALJ's RFC finding on those issues was "reasonable." (Dckt. # 36 at pp. 13-14). Courts have explained that such conclusory reasoning constitutes "nothing more than an unadorned, and illogical *ipse dixit* . . . [that is] hopelessly at odds with the logical bridge requirement." *Lopez v. Berryhill*, 340 F.Supp.3d 696, 704 (N.D.Ill. 2018) (criticizing a similar claim by the Commissioner). The Commissioner has not cited anything in the 1,200 page record that supports the ALJ's findings on plaintiff's ability to lift, carry, sit, stand, or walk. Instead, the Commissioner simply refers the Court to the ALJ's decision itself, resulting in a circular argument in which the ALJ's finding is presumed to speak for itself. (Dckt. # 36 at p. 9). The Commissioner's minimal response therefore waives plaintiff's claim that the ALJ failed to explain why she assessed these exertional capabilities. *See Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that 'skeletal' arguments may be properly treated as waived.") (citing cases).

The Commissioner's failure to city any support for this aspect of the ALJ's finding may be due to the fact that the ALJ likewise failed to cite any evidence concerning plaintiff's capacity for lifting, carrying, pushing, or pulling in her RFC discussion. She did not explain how she concluded that plaintiff would be able to sit, stand, or walk up to six hours a day. The ALJ's failure to address these critical aspects of the RFC is highlighted by the fact that she attempted to link the record to a number of her other RFC findings. She stated, for example, that plaintiff was limited to only a few changes in her routine work schedule because plaintiff testified that her PTSD caused her to be irritable. (R. 31). The ALJ also found that plaintiff's migraine headaches

warranted a restriction of no outside work or work with more than moderate noise. (R. 32). These are the kind of common-sense explanations that build a logical bridge between the record and an RFC assessment – a task that only requires minimal explanation by the ALJ. *See Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D.Ill. 2012) ("A simple trestle will suffice so long as it allows the reviewing judge to traverse safely the divide between the evidence and the conclusions.").

The Commissioner claims that the ALJ sufficiently discussed her reasons for the RFC because her decision is 20 pages long. (Dckt. # 36 at p. 10). However, the length of the decision, in itself, sheds no light on the sufficiency of the content of the decision. If anything, the unusual length of the ALJ's decision makes it all the more surprising that she did not address these critical aspects of the RFC more carefully. The ALJ summarized most of the medical record concerning plaintiff's knee and back complaints. Without providing an appropriate explanation, however, merely reviewing the record does not replace an ALJ's duty under SSR 96-8p to explain "how the evidence supports each conclusion." SSR 96-8p, 1996 WL 374184, at *7. In sum: an evidentiary summary is not sufficient when it leaves a court wondering how the ALJ derived a claimant's work abilities from data like x-rays and reports. *See Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D.Ill. Sept. 26, 2018) ("Merely summarizing the record, however, is not in itself a substitute for an ALJ's duty to explain the basis of the RFC."); *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480, at *4 (N.D.Ill. May 6, 2015); *Chuk v. Colvin*, No. 13 C 8409, 2015 WL 6687557, at *8 (N.D.Ill. Oct. 30, 2015).

In this case, the ALJ's discussion makes it difficult for the Court to follow the basis of her reasoning. She only specifically addressed plaintiff's testimony about her ambulatory limitations in one paragraph in which the ALJ gave six reasons for rejecting plaintiff's claim that

she could walk for 15 minutes at a time.  (R. 27).  None of them adequately connect the RFC

with the record.  First, the ALJ first said that plaintiff was able to care for her personal needs.

However, plaintiff described those activities as minimal:  she has to stop while showering and

dressing; cannot mop or sweep for long; and only cooks quick meals.  (R. 93).  Such a restricted

range of activity does not contradict plaintiff's testimony about her ability to walk or stand.

Second, the ALJ noted that plaintiff appeared to be in good spirits at the hearing – a fact that has

no obvious causal relation to plaintiff's exertional capacity.  Third, the ALJ pointed out that

plaintiff's physical problems became worse "years after her work stoppage." (R. 27).  That does

not address plaintiff's disability claims because she stopped working in 2010 but alleges that she

only became disabled on May 19, 2013.  (R. 17).  Fourth, the ALJ pointed out that plaintiff had a

normal gait "contrary to her assertions." (R. 27).  That observation overlooks the fact that

plaintiff never claimed that her *gait* is abnormal or that she needs to use an assistive device;

rather, plaintiff contends that she cannot sustain activity for long periods of time.  The ALJ never

drew any connection between that allegation and plaintiff's gait. The ALJ stated as her fifth

reason that plaintiff had no neurological deficits.  However, plaintiff suffers from degenerative

joint and disc disease and the ALJ cited no evidence that any expert doubted her pain-related

complaints because she had no neurological deficits.

Finally, the ALJ noted that plaintiff had normal muscle strength and cited a report stating

that her musculoskeletal structure was "grossly [normal]." (R. 27, 646).  Without further

discussion, neither of these facts explains why plaintiff could do what the ALJ said she could.  In

medical terms, "gross" means "large enough to be visible to the naked eye." *Steadman's*

*Medical Dictionary* 749 (26th ed. 1995).  The Court fails to understand why the fact that

plaintiff's joints looked normal means that she can carry out light work.  Moreover, it is

undisputed that they were *not* normal as reflected by a December 2015 x-ray showing that she had moderate arthritic changes in both of her knees, and an MRI of the lumbar spine showing a L4/L5 disc bulge with "advanced degenerative disc changes" at L5/S1. (R. 884-86).

The fact that plaintiff had normal muscle strength also fails to elucidate the basis of the ALJ's reasoning under these facts. The Court recognizes that ALJs may (and often do) cite findings such as a claimant's normal joint flexion and muscle strength to support an RFC assessment. In this case, however, this practice was insufficient because the ALJ failed to adequately address another line of evidence that calls her reasoning into question. In particular, Dr. Veerasamy Pillay issued a disability report to the VA on July 1, 2016 that assessed a "moderate disability" due to plaintiff's joint pain. Like the ALJ, Dr. Pillay was aware that plaintiff had normal muscle strength because she indicated as much in her report. Notwithstanding this acknowledgment, Dr. Pillay determined that plaintiff's knees justified a moderate disability rating. (R. 922, 927). In other words, the fact that plaintiff had muscle strength did not necessarily mean that she was free of limitations and did not experience the pain that she described to the ALJ. Instead of addressing Dr. Pillay's findings, however, the ALJ erroneously dismissed her report for the reasons discussed more fully below.[6] *See infra* at pp. 15-16.

---

[6] Plaintiff argues that the ALJ also failed to consider the effect that her obesity had on her joints. An ALJ is required to address the impact that obesity has on a claimant's functioning when it is combined with the other impairments that exist. *See* SSR 02-1p; *Goins .v Colvin*, 764 F.3d 677, 681 (7th Cir. 2014). The ALJ's only consideration of this issue was to state in summary form that plaintiff was able to walk without a cane "despite her complaints and morbid obesity." (R. 18). The Court agrees that was inadequate. That does not require reversal in itself because a claimant is not entitled to remand on obesity grounds without first providing evidence of any restrictions that exist. *Capman v. Colvin*, 617 Fed.Appx. 575, 580-81 (7th Cir. 2015). Plaintiff has not done so here. Since this case already requires remand, however, the ALJ should consider with greater care the effect that obesity may have on plaintiff's functioning.

The end result is that the ALJ did not explain what it was that supported her finding concerning plaintiff's ability to walk, stand, sit, push, pull, or lift. Only one physical RFC was available to the ALJ. As mentioned earlier, *supra* at p. 3, state-agency expert Dr. Madala found that plaintiff could engage in "heavy/very heavy" work. (R. 154). That meant that plaintiff – an obese 50-year old woman with migraines – could lift and carry 50 pounds frequently and up to 100 pounds at a time for eight hours a day. *See* 20 C.F.R. § 404.1567(e) (defining very heavy work). The ALJ said that Dr. Madala's RFC was "appropriate" when she issued it in October 2014 but that subsequent evidence justified the ALJ's reduced RFC. (R. 32). Neither the ALJ nor the Commissioner has explained how the ALJ determined that plaintiff's ability to lift and carry up to 100 pounds was reduced by 80 percent from 2014 to 2017. Both are also silent on how the ALJ went about deciding that plaintiff could walk up to six hours a day instead of, say, five, or three, or even one hour each day.[7] It was not sufficient for the ALJ to show that the evidence contradicted plaintiff's testimony. She had an affirmative duty to explain why the evidence supported the ALJ's own RFC assessment. Even if the record arguably supports the RFC, remand is still required when an ALJ fails to carry out that obligation. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("Contrary to SSR 96-8p, however, the ALJ did not explain how he arrived at these [RFC] conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision.").

The ALJ's non-compliance with SSR 96-8p is further complicated in this case by inadequate attention to three other issues that could have affected plaintiff's ability to work full

---

[7] The issue was critical to the ALJ's decision because, as plaintiff points out, a finding that she was limited to sedentary work could indicate that she was disabled under the medical vocational guidelines because she was approaching 50 years in age at the time of her disability application. *See* 20 C.F.R. Part 404 , Subpt. P, App. 2, Table No. 1, Rule 201.10).

time.  Plaintiff told consulting psychologist Dr. Fine that she spent most of the day in her room "trying to rest or sleep."  (R. 489).  Dr. Kathleen Richard further noted on July 16, 2014 that plaintiff falls asleep at 4:00 a.m., gets up at 10:00 a.m., then sleeps from 11 to noon.  (R. 674). Plaintiff testified along similar lines at the April 8, 2013 administrative hearing and claimed sleepiness as a side effect of her medications.  (R. 136, 408).  The ALJ erroneously overlooked all of this evidence.  *See Brown v. Astrue*, No. 12 C 1750, 2012 WL 6692139, at *13 (N.D.Ill. Dec. 19, 2012) (remanding when an ALJ failed to address allegations of daytime sleepiness).

The ALJ also did not consider everything that was relevant to plaintiff's migraine condition, which posed the most serious barrier to her ability to work.  Plaintiff testified that her migraine pain required her to lie down for three hours after it started.  (R. 90).  Like plaintiff's sleepiness, the ALJ did not take notice of those statements.  The ALJ was required to explain either (1) why plaintiff's testimony could not be accepted or (2) why she could work on a full-time basis despite her alleged need to lie down for three hours when she experienced migraines. Failing to address what plaintiff stated constitutes reversible error because an ALJ cannot "cherry-pick" evidence that supports a finding and ignore relevant parts of the record that are contrary to it, including a claimant's testimony.  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *McDonald v. Astrue*, 858 F.Supp.2d 927, 940 (N.D.Ill. 2012).

Finally, the ALJ failed to account properly for the disability report mentioned earlier that Dr. Veerasamy Pillay issued for the VA on July 1, 2016.  *See supra* at p. 13.   In addition to a moderate disability due to knee pain, Dr. Pillay concluded that plaintiff had a "severe disability" based on migraines and would be unable to work ten days a month.  (R. 930).  The VA eventually determined that plaintiff was entitled to a 60 percent disability rating for migraine pain.  (R. 502).

The ALJ disagreed with Dr. Pillay's migraine findings because plaintiff was taking medication to treat her migraine symptoms. (R. 28). Dr. Pillay knew that fact but nonetheless she found that plaintiff had a severe disability despite her medication. (R. 928). The ALJ also criticized the VA report because plaintiff had undergone a brain MRI that showed normal results. As a non-expert, the ALJ had no basis for determining what diagnostic implication plaintiff's MRI had for her migraine headaches. It could have been irrelevant for all the ALJ knew because "[d]octors use MRIs to rule out other possible causes of headaches – such as a tumor – meaning that an unremarkable MRI is completely consistent with a migraine diagnosis." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). The ALJ was not entitled to set Dr. Pillay's finding aside based on the MRI without citing some form of medical evidence showing that Dr. Pillay misunderstood the meaning of the normal MRI. By not doing so, the ALJ verged on "playing doctor" by making her own medical determination without proper guidance or evidence. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996); *Armstrong v. Barnhart*, 287 F.Supp.2d 881, 887 (N.D.Ill. 2003) (explaining that "playing doctor" arises when an ALJ either rejects a physician's conclusion with citing evidence or when the ALJ draws medical conclusions without relying on evidence for it).

The ALJ also stated that Dr. Pillay's report was entitled to "very little weight" because it was produced for the VA, which uses a different standard for analyzing disability claims than the SSA does. (R. 28). It is true that the two agencies use separate guidelines for assessing disability though the Seventh Circuit has characterized the distinctions between them as "small." *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *see also Bird v. Berryhill*, 847 F.3d 911, 913 (7th Cir. 2017) ("[T]he VA's evaluation is pro-claimant rather than neutral . . . . . That is not the

SSA's approach.").  It is also true that a disability rating from the VA is not binding on the SSA.[8]

Nevertheless, the ALJ was still required to give the VA's finding "some weight," *Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir. 2006), and she could not dismiss it *because* Dr. Pillay used a different standard.  To the contrary, a VA disability report is "evidence that needs to be properly considered."  *Cannon v. Berryhill*, No. 1:18 C 203, 2019 WL 1011872, at *12 (N.D.Ind. March 4, 2019) (stating that an ALJ's assessment is "incomplete" without such consideration).

For all these reasons, remand is necessary so that the ALJ can build a logical bridge between the record and the RFC assessment.  Having rejected the only physical RFC in the record, the ALJ proceeded to make findings about plaintiff's exertional abilities without even referring to lifting, carrying, pushing, or pulling in her discussion or identifying the evidence that led her to find that plaintiff can stand and walk six hours a day.  "The ALJ simply cannot do this."  *Bailey v. Barnhart*, 473 F.Supp.2d 822, 839 (N.D.Ill. 2006).

### B.        The ALJ Failed to Explain the Basis of the Symptom Analysis

Once an ALJ determines that a claimant has a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the symptoms that can reasonably be expected to stem from it.  A court may overturn a symptom evaluation if the ALJ fails to justify his or her conclusions with specific reasons that are supported by the record.  *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017).  An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of his symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate the condition; and functional restrictions that result from or are used to treat the claimant's symptoms.  20 C.F.R. § 404.1529(c); SSR 16-3p.  When

---

[8] *Bird* noted that when a veteran has been found to be less than 100 percent disabled but is still unemployable that "is practically indistinguishable from the SSA's disability determination, which asks whether a medically determinable impairment prevents the claimant from engaging in past relevant work or any substantial gainful work that exists in the national economy."  *Bird*, 847 F.3d at 913.

considering a claimant's symptoms, the ALJ must build a logical bridge between the symptom evaluation and the record. *See Cullinan*, 878 F.3d at 603; *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring an analysis of the SSR 16-3p factors as part of a logical bridge for the symptom evaluation).

The Court does not address the ALJ's analysis of these issues in detail because this case already requires remand on other grounds. Plaintiff told the ALJ that she cared for her son and also had cared for her terminally-ill father before he died. The ALJ cited those facts twice to find that they were inconsistent with her alleged symptoms. (R. 26, 27). In reality, neither of them supports the ALJ's conclusion. Plaintiff stated next to nothing about what she did for her son other than to get him off to school. Even then, she testified that she had to go back to bed once he was out of the house. (R. 136). Her care for her father was even more limited because he had a paid caregiver four days a week in addition to plaintiff. Her activities were restricted to driving him in a car three times a week and putting out his medications. (R. 117). The Court can see no commensurability between such minimal tasks and the ability to work full time. *See Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) ( "[W]e have urged caution in equating these activities with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member.").

The ALJ's symptom analysis relied most heavily on the fact that plaintiff had not always been compliant with her treatment recommendations and failed at times to show up for her medical appointments. The ALJ cited plaintiff's noncompliance an astonishing 23 times throughout her decision and dedicated a full paragraph to the issue. (R. 27). She even invoked it several times to criticize the conclusions of medical experts. The ALJ stated, for instance, that Dr. Pillay's VA report was less reliable because it "did not discuss the claimant's non-

compliance" with the treatment recommendations that her doctors prescribed. (R. 28). Consulting psychologist Dr. Fine's report was called into question because it failed to note plaintiff's "ongoing non-compliance," as were the reports of treating psychiatrist Dr. Tsai and the findings of therapist Ms. Dickerson. (R. 25, 26, 29). That made noncompliance the determinative issue that the ALJ relied on to assess plaintiff's symptom claims.

It is well established that a claimant's failure to follow the treatment recommendations of her doctors can be a ground for questioning the severity of her symptoms. *See*, *e.g.*, *Craft*, 539 F.3d at 679. SSR 16-3p is clear, however, that an ALJ may not discount a claimant's symptom-related statements based on a sporadic treatment history without first inquiring into the reasons for the noncompliance:

> We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment *or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.*

SSR 16-3p at *9 (emphasis added). Courts have repeatedly stressed that an ALJ "must not draw any inferences about a claimant's condition from this failure [to pursue treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft*, 539 F.3d at 679; *see also Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

Contrary this guideline, the ALJ showed almost no interest in plaintiff's noncompliance at the two administrative hearings she held. In fact, she only raised the issue once by asking at the July 15, 2016 hearing if plaintiff had kept all of her physical therapy appointments. When plaintiff said that she had not, the ALJ moved to another topic without further discussion or even inquiring into what caused the noncompliance. (R. 83). Plaintiff's representative briefly revisited the topic later in the hearing but the ALJ again remained silent and never asked plaintiff

to explain what kept her from being more compliant. (R. 94). At a hearing conducted by a different ALJ on April 8, 2013, the ALJ noted that plaintiff had missed some appointments and asked why that was the case. When plaintiff stated that she had headaches, the ALJ proceeded to other issues with no further discussion of the matter. (R. 127).

The Commissioner argues that the ALJ did not need to inquire more deeply into the noncompliance issue at the hearing because plaintiff was represented by counsel. *See Nicholson v. Astrue*, 341 Fed.Appx. 248, 254 (7th Cir. 2009) ("The degree of the ALJ's responsibility to take the initiative is influenced, if not entirely dictated, by the presence or absence of counsel for the claimant."). The Commissioner fails to note, however, that plaintiff was accompanied at the hearing by a non-attorney representative, not by an attorney. (R. 173). Courts have not held such a representative to the same standards as an attorney because "while sometimes effective, [he or she] lacks the training of an attorney and is not a substitute for an attorney." *Watkins v. Colvin*, No. 3:12 C 491, 2014 WL 683849, at *9 (N.D.Ind. Feb. 21, 2014). The ALJ should have been aware of the difference between counsel and a non-attorney representative and fulfilled her duty to question plaintiff about her noncompliance. *See* SSR 16-3p at *9 ("*We* may need to . . . ask why he or she has not complied[.]") (emphasis added).

The ALJ's failure to pursue this line of inquiry is inexplicable, particularly when juxtaposed against her exacting post-hearing searching of the record to document the instances of plaintiff's non-compliance. To make matters worse, both the first and the second ALJ should have known that it was especially important to question plaintiff on this topic because she suffers from a mental illness. ALJs are required to consider the possibility that "mental illness . . . may prevent the sufferer from . . . submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006); *see also Hunt v. Astrue*, 889 F.Supp.2d 1129, 1144 (E.D.Wis. 2012) (citing

cases). The Commissioner states – without explanation – that plaintiff's "alleged 'mental illness'" does not come into play in this matter. (Dckt. # 36 at p. 6). However, the Commissioner's statement ignores the ALJ's finding at Step 2 that plaintiff's severe impairments included PTSD, an affective disorder, and an anxiety disorder that needed to be accommodated in the RFC. (R. 18). Thus, as the ALJ found, these are not "alleged" illnesses. They are real, serious, and restrictive.[9]

Even without further inquiry with plaintiff herself, the ALJ could have easily clarified whether plaintiff's mental impairments interfered with her compliance by discussing it with the psychological expert who appeared at the November 29, 2016 hearing. What the ALJ could not do was to gloss over plaintiff's missed appointments at the hearing and then repeatedly use the issue in her decision to discount the severity of her symptom testimony. That is tantamount to no inquiry at all. Since this case already requires remand, the ALJ is directed to explore with greater care why plaintiff was not fully complaint with treatment and medications.

## III. CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment (Dckt. # 28) is granted. The Commissioner's motion for summary judgment (Dckt. # 35) is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) re-evaluate plaintiff's symptoms using the criteria set out in SSR 16-3p and (2) reassess the RFC including further

---

[9] Plaintiff's mental impairments might even have prevented her from stating, or even understanding, all of the reasons that were involved in her chronic failure to show up for appointments. The Court notes in this regard that plaintiff's testimony was unclear or confused on several topics. Plaintiff could not accurately recall her traumatic experience in Operation Desert Storm or the timeline surrounding alleged cortisone injections in her knees. (R. 85-86). Perhaps the minimal opportunity she had to explain her noncompliance involved a similar confusion.

consideration of the effect of plaintiff's obesity, alleged sleepiness, and need to lie down for hours to relieve migraine pain.


**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated:  May 20, 2019**